IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| T-REX PROPERTY AB, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 1:16-cv-06932 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| TABLETOP MEDIA, LLC d/b/a ZIOSK, | § | |
| | § | |
| *Defendant*. | § | |

---

## MEMORANDUM IN SUPPORT OF ZIOSK'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6)

---

Samuel E. Joyner
 Texas Bar No. 24036865
 sjoyner@ccsb.com
**CARRINGTON, COLEMAN, SLOMAN &
 BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
TELEPHONE: (214) 855-3000
FACSIMILE: (214) 855-1333

*Attorneys for Defendant
Tabletop Media, LLC d/b/a Ziosk*

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........................................................................1

II. NATURE OF THE CASE ................................................................................1

III. NATURE OF THE MATTER ...........................................................................2

  A. The '470 patent is directed to the abstract idea of using computers to manage the display of information in public places based on third party instructions. ...............................................2

  B. The '334 patent is directed to the abstract idea of displaying information (*e.g.*, adveritsment) on display devices. ...............................5

  C. The '334 patent is directed to advertisements on a billboard. ...............7

IV. ARGUMENT AND AUTHORITIES .................................................................8

  A. Patentable subject matter under 35 U.S.C. § 101 is a threshold legal issue appropriaptely decided at the pleadings stage of litigation............................9

  B. The patents-in-suit are invalid due to lack of patentable subject matter................11

   1. The asserted claims are drawn to an abstract idea... ...................................11

   2. The asserted claims contain no "inventive concept" to transform the abstract idea into a patent-elibgible invention.. ....................................12

V. CONCLUSION.....................................................................................16

**TABLE OF AUTHORITIES**

## Cases

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
2015-2080, 2016 U.S. App. LEXIS 17370 (Fed. Cir. Sept. 23, 2016) ........................... *passim*

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
134 S. Ct. 2347 (2014) .................................................................................................... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 4, 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................... 8, 9

*Bilski v. Kappos*,
561 U.S. 593 (2010) ......................................................................................................... 4

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) ...................................................................................... 12

*Elec. Power Grp., LLC v. Alstom S.A.*,
No. 2015-1778, 2016 U.S. App. LEXIS 13861 (Fed. Cir. Aug. 1, 2016) .................. 11, 12, 15

*Fernandez-Montes v. Allied Pilots Ass'n*,
987 F.2d 278 (5th Cir. 1993) ........................................................................................... 9

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) ........................................................................................ 10

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) ...................................................................................... 10

*O2 Media, LLC v. Narrative Sci. Inc.*,
149 F. Supp. 3d 984 (N.D. Ill. 2016) ............................................................................. 11

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012) ................................................................................................ *passim*

*Nextpoint, Inc. v. Hewlett-Packard Co.*,
No. 15 C 8550, 2016 U.S. Dist. LEXIS 74470 (N.D. Ill. June 8, 2016) ........................ 11

*SnowCast Sols. LLC v. Endurance Specialty Holdings, Ltd.*,
No. 15 CV 5305, 2016 U.S. Dist. LEXIS 37559 (N.D. Ill. Mar. 23, 2016) .................... 10

*TLI Commc'ns v. AV Auto., L.L.C.*,
823 F.3d 607 (Fed. Cir. 2016) .................................................................................... 14, 15

*T-Rex Property AB v. AutoNetTV Media, Inc.*,
No. 1:16-cv-06649 (N.D. Ill.), ................................................................................1

*Ultramercial, Inc. Hulu, LLC*,
No. 2010-1544, 2014 U.S. App. LEXIS 21633 (Fed. Cir. Nov. 14, 2014) ...........................11,

**Statutes**

35 U.S.C. § 101 ...........................................................................................................1, 9, 11

**Other Authorities**

Fed. R. Civ. P. 12............................................................................................................1, 8

## I.    PRELIMINARY STATEMENT

T-Rex[1] is a Swedish non-practicing entity who allegedly owns three patents that it asserted to extort money out of a Texas operating company. The asserted claims cobble together generic computer components, and then claim the end result of dynamic updates and third-party control that is not limited to a specific mechanism for achieving that result. Therefore, the asserted claims are patent-ineligible subject matter. Since resolving this threshold legal issue does not require discovery or formal claim construction, Ziosk respectfully moves this Court to dismiss T-Rex's claims as invalid because they claim an abstract idea lacking any "inventive concept" to make them eligible for patent protection.

## II.    NATURE OF THE CASE

This action arises from the invention, patenting, and commercialization of the "Ziosk," a device that allows restaurant patrons to order meals, play games, and pay their checks at their table. Based in Dallas, Texas, Ziosk is the first pay-at-the-table tablet for the restaurant market. The technology, featuring a 7-inch Android OS touchscreen and credit card reader, resides on each table and enables the guests to see menu items, play games, view news, order food and beverages and "pay on demand"; all which gives guests control over their dining experience.[2]

T-Rex filed this action on July 1, 2016 accusing Ziosk of infringing claims 25 and 26 of U.S. Patent No. RE39,470 (the "'470 patent"), claims 22 and 32 of U.S. Patent No. 7,382,334 (the "'334 patent"), and claims 42 and 43 of U.S. Patent No. 6,430,603 (the "'603 patent") (collectively, the "patents-in-suit" and "asserted claims"). Since 2012, T-Rex has filed over forty patent-infringement actions involving one or more of the patents-in-suit against over sixty

---

[1] "Tyrannosaurus rex [abbreviated T-Rex] was one of the largest meat-eating dinosaurs that ever lived. Everything about this ferocious predator, from its thick, heavy skull to its 4-foot-long (1.2-meter-long) jaw, was designed for maximum bone-crushing action." *See* http://animals.nationalgeographic.com/animals/prehistoric/tyrannosaurus-rex/.
[2] *See* http://www.ziosk.com/.

defendants in seventeen judicial districts throughout the United States.[3] The majority of these actions have been voluntarily dismissed, and not a single action has been decided on the merits.

## III.    NATURE OF THE MATTER

The '470 and '334 patents are both titled "Digital Information System," while the '603 patent is titled "System for Direct Placement of Commercial Advertising, Public Service Announcements and Other Content on Electronic Billboard Displays." The '470 patent is a reissue of U.S. Patent No. 6,005,534 ("the '534 patent"), which is not asserted in this action. The '334 patent is a continuation-in-part of the '534 patent, and thus also a continuation-in-part of the reissued '470 patent. Even though the '603 patent is not part of this patent family, the differences between the '470 and '334 patents, on one hand, and the '603 patent, on the other, are insignificant for purposes of this motion. In short, the patents-in-suit disclose nothing more than using generic computer components to perform a task that was once done by hand.

**A.    The '470 patent is directed to the abstract idea of using computers to manage the display of information in public places based on third party instructions.**

The '470 patent is directed to using computers to manage the display of information in the context of public places, such as subway stations, railway stations, and airports. *See* '470 patent, col. 1:21-24. The patent identifies a problem with the display of information (*e.g.,* schedules, advertisements, etc.) throughout a subway or railway station or airport in that the information is "static" and not updated or changed quickly because the station is not "effectively coordinated." *Id.* at 2:15-33. Accordingly, the '470 patent is directed to "a flexible system" that enables "pictures, images, messages and announcement to be configured in accordance with modern digital technology" and "be changed in practice as often as is desired, in real time." *Id.* at 2:40-52. The alleged invention operates by receiving information and instructions at a central

---

[3] *See T-Rex Property AB v. AutoNetTV Media, Inc.*, No. 1:16-cv-06649 (N.D. Ill.), Dkt. #15 at 5.

computer system from "external information mediators." *Id.* at 6:65-67. An "information mediator" includes "companies and private persons who wish to utilize the system," such as advertising agencies. '470 patent, col. 5:18-21. The central computer then uses the instructions and information provided by the "information mediator" to display the information. *Id.* at 7:1-9.

The sole drawing of the '470 patent depicts the system as follows:



As the specification describes, the central computer (28) receives instructions and information from the information mediators (24) via a standard modem (26). *See* '470 patent, col. 6:65-67. In some embodiments, the central computer (which may comprise multiple standard computer servers) uses the received instructions to create an "exposure list" of what, where, when, and for how long to display the received information. *Id.* at 7:11-54. In another embodiment, personnel working for the information mediator physically go to the control centre [sic] and manually enter instructions and information at the working stations (32). *Id.* at 8:10-20. "Personnel at the working stations 32 are thus able to . . . update the exposure list." *Id.* at 8:21-23. The central computer then sends the information to the station computers (34) at subway stations (16), (18), and (20) for display on a "projector" in accordance with the exposure list

generated from the provided instructions. '470 patent, col. 11:6-7, 11:39-44. In short, the invention described in the '470 patent is simply the entry of information and instructions by a company, like an advertising agency, via modem or by manual entry by a human being, into a standard computer, which then sends the information to a standard projector for display according to the instructions.

T-Rex has specifically asserted claims 25 and 26 of the '470 patent, shown below:

| Element | Claim 25 | Claim 26 |
|---|---|---|
| | 25. A method of selectively displaying digital information at one or more of a plurality of locations, said method comprising: | 26. A system for selectively displaying digital information at one or more of a plurality of locations, said system comprising: |
| 1 | receiving control instructions from at least one external information mediator; | a computerized control center having a plurality of communication interfaces for receiving control instructions from at least one external information mediator, |
| 2 | using said control instructions to generate an exposure list, said exposure list specifying three or more of the following items:<br>    i.) what information content is to be displayed;<br>    ii.) at which of said plurality of locations said information content is to be displayed;<br>    iii) when said information content is to be displayed for each location at which content is to be displayed; and<br>    iv) how long said information content is to be displayed for each location at which content is to be displayed; | said computerized control center including means for generating and dynamically updating an exposure list from said control instructions, said exposure list specifying three or more of the following items:<br>    i) what information content is to be displayed;<br>    ii) at which of said plurality of locations said information content is to be displayed;<br>    iii) when said information content is to be displayed for each location at which content is to be displayed; and<br>    iv) how long said information content is to be displayed for each location at which content is to be displayed; |
| 3 | displaying images at one or more of said locations in accordance with said exposure list; | a computerized device situated at each one of said plurality of locations, each computerized device being electronically coupled to said computerized control center; and a means for displaying images in accordance with said exposure list associated with each one of said computerized devices. |

4

| 4 | and permitting said exposure list to be dynamically updated. | |
|---|---|---|

System claim 26 is no different from method claim 25 in substance. The method claim recites the abstract idea implemented on a generic computer; and the system claim recites a handful of generic computer components configured to implement the same idea. The claims are directed to nothing more than (1) receiving instructions for displaying information (Element 1); (2) the instructions including what information to display, and where, when and how long to display it (Element 2); (3) displaying the information per the instructions (Element 3); and (4) allowing the instructions to be updated "dynamically" (Element 4).

Claims 25 and 26 track the only figure in the patent. Element numbers have been added to the claims in the table above for ease of identifying the claim elements. Element 1 describes that instructions are received from a "mediator." A mediator can be a company, a person, or a computer controlled by a company or a person. *See* '470 patent at 5:18-23; 4:49-51. Element 2 provides that instructions are used to generate an exposure list, which contains what, where, when, and how long to display information. *Id.* at 7:10-17. Element 3 describes displaying the information. The final element, Element 4, states that the exposure list can be updated dynamically or in real time. *Id.* at 1:54-59. The other independent claims (claims 1, 13) are directed to the same abstract idea.[4]

**B.** **The '334 patent is directed to the abstract idea of displaying information (*e.g.*, advertisements) on display devices.**

The '334 patent is a continuation-in-part of the '470 patent. The only difference between the '334 patent and the '470 patent is that the information to be displayed is sent to cinemas and TVs ('334 patent) instead of subway stations ('470 patent). That difference is apparent in the patents' figures. In the '334 patent, the subway station and projector (16 and 22 in the figure) in

---

[4] Claims 1 and 25 are method claims and claims 13 and 26 are system claims.

the '470 patent have been replaced by cinema, camera, and TV-set (16, 22 and 40 in the figure).

*See* '334 patent, 5:59-63. The systems in the two patents are otherwise the same.

T-Rex asserts independent claims 22 and 32 of the '334 patent, where one claim is a method claim and the other a system claim:

| Claim 22 | Claim 32 |
|---|---|
| 22. A method of coordinating and controlling electronic displays in a digital information system for exposing information on at least one display device through the medium of at least one electronic display, characterized in that it comprises the following steps: | 32. An arrangement for coordinating and controlling electronic displays in a digital information system for displaying information on at least one display device through the medium of at least one electronic display, said information being supplied by mediators of information, for exposure or display, characterized in that it comprises: |
| | computerized control center means, wherein the control center has communication interfaces against; |
| | computerized means for coordinating and controlling electronic displays; |
| generating an exposure list comprising control instructions for coordinating and controlling electronic displays with regard to what shall be exposed, when it shall be exposed, where it shall be exposed and for how long it shall be exposed; | center functions, in real time and through the medium of said exposure handler, to create and update an exposure list having control instruction fields, via dynamic booking of display information from mediators; and |
| using a control center for coordinating and controlling electronic displays, wherein the control center is able to create and update said exposure list in real time with control instruction fields via dynamic booking of information in time for exposure from mediators; and | wherein said exposure list, containing control instructions, coordinates and controls the electronic displays in question with respect to what shall be exposed, where it shall be exposed, when it shall be exposed, and for how long it shall be exposed, |
| wherein the exposure list enables each electronic display to be controlled, independently of other electronic displays, to receive the same or different information in accordance with the exposure list for exposure of respective electronic display. | and enables each electronic display independently of other electronic displays, to receive the same or different information according to the exposure list for exposure or display by respective electronic display. |

As is shown in the table above, system claim 32 is no different from method claim 22 in substance and includes the same elements. The method claim recites the abstract idea

6

implemented on a generic computer; and the system claim recites a handful of generic computer components (*e.g.,* "computerized control center means") configured to implement the same idea.

**C.    The '603 patent is directed to advertisements on a billboard.**

The '603 patent, titled "System for Direct Placement of Commercial Advertising, Public Service Announcements and Other Content on Electronic Billboard Displays," names a different inventor, but like the '470 and '334 patents, is directed to the abstract idea of displaying information in public places based on third party instructions. Directed to billboards, the '603 patent permits advertisers to electronically select locations and times to display advertisements. *See* '603 patent, Abstract.

According to the '603 patent's specification, scheduling the display of third-party information on a billboard was far from a novel idea and has "remained essentially unchanged throughout the twentieth century." *Id.* at 1:32-33. The patentee also acknowledged that he did not invent the use of electronic billboards. *Id.* at 1:54-55. Because of "[t]he high cost of printing, transporting and mounting a message on a conventional billboard[, however,] . . . a conventional billboard cannot be readily changed to reflect current events within the geographic area of the billboard." *Id.* at 1:34-39. Hence, like the '470 and '334 patents, the '603 patent simply purports to streamline a pre-existing system by adding generic computer components. *See id.* at 2:4-15.

Figure 1 includes a "network" comprising a "plurality of electronic displays 30." *Id.* at 2:50-65; Fig. 1. A customer may access the "central information processing station" via the Internet through a "Customer Interface Web Server 40" to obtain and enter security code and billing code information. *Id.* at 2:66-3:6. After selecting a time and location, the customer "transmits the advertising content on-line through the Internet, a direct phone line or a high speed connection (for example, ISDN or DSL)" for content review by a "system security employee" before the content is "read to the server 100 associated with each display 30." *Id.* at 3:22-30. No

special components are required. Instead, the '603 patent indicates that "a suitable server is the IBM RISC 6000 server." *Id.* at 3:29-30. The system verifies that advertisements are run as scheduled and produces billing and reporting information. *Id.* at 3:62-4:4:49.T-Rex asserts claims 42 and 43 of the '603 patent, both of which depend from claim 13:

| Claim 13 |
|---|
| 13. A system for presenting video or still-image content at selected times and locations on a networked connection of multiple electronic displays, said system comprising: |
| a network interconnecting a plurality of electronic displays provided at various geographic locations; |
| means for scheduling the presentation of video or still-image content at selected time slots on selected electronic displays of said network and receiving said video or still-image content from a content provider; |
| transmission means in communication with said receiving means for communicating scheduled content to respective server devices associated with corresponding selected electronic displays of said network, |
| each said associated device initiating display of said video or still-image content at selected times on a corresponding selected electronic display of said network. |

Dependent claim 42 is directed to displaying images on a split screen. *Id.* at cl. 42. Dependent claim 43 indicates that the split screen of claim 42 is capable of displaying a still image in one display area and a real time video, near real time video, or still frame in a second display area. *Id.* at cl. 43.

Given the close similarities between the three patents and all of the asserted claims, the analysis of the three patents is the same for the purposes of this motion. All three patents are directed to the same abstract idea of collecting display instructions from external content providers, organizing the display content at a central computer, and then displaying the content on electronic displays.

## IV.    ARGUMENT AND AUTHORITIES

A complaint must be dismissed pursuant to Rule 12(b)(6) when a plaintiff fails to plead facts that establish "a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555 (2007). Neither "conclusory allegations" nor "legal conclusions masquerading as factual conclusions" suffice to defeat a motion to dismiss. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). Rather, a complaint must contain "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Because T-Rex's patent infringement claims are based on patent-ineligible inventions, the Court should grant Ziosk's motion to dismiss for failure to state a claim.

A. **Patentable subject matter under 35 U.S.C. § 101 is a threshold legal issue appropriately decided at the pleadings stage of litigation.**

Section 101 of the Patent Act defines patentable subject matter: "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Supreme Court precedent carves out three specific exceptions to § 101's broad patent-eligible principles: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). These exceptions represent "the basic tools of scientific and technological work." *Id.* The Court explained in *Alice* that because the Patent Act's primary object is "[t]o promote the Progress of Science and useful Arts," patent protection must not extend to the "building blocks of human ingenuity," since "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.* Accordingly, in applying the § 101 exceptions, district courts "must distinguish between patents that claim such building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Id.*

In *Mayo*, the Supreme Court established a two-part framework for distinguishing between patents claiming "abstract ideas" and those that claim patent-eligible applications of those ideas.

*Alice*, 134 S. Ct. at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)). The first step asks whether the asserted claims are directed to a patent-ineligible concept—*i.e.*, law of nature, natural phenomena, and abstract idea. *Id.* If "yes," the analysis proceeds to the second step, which examines the elements of each claim both individually and "as an ordered combination" to ascertain whether the claim "contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2355, 2357. The guiding principle in applying the *Mayo* test is "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Id.* at 2354. Claims which yield a "yes" answer to both questions are patent eligible, as are those which generate a "no" answer to the first question. Claims that yield a "yes" to question one, but a "no" to question two are not patent eligible.

"Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, 561 U.S. 593 (2010). "Patent eligibility is a legal question that may be resolved by reference to the complaint and the patent, without factual development, when the claims—considered in a manner most favorable to the non-movant—do not amount to more than an abstract idea without a transformative inventive concept." *SnowCast Sols. LLC v. Endurance Specialty Holdings, Ltd.*, No. 15 CV 5305, 2016 U.S. Dist. LEXIS 37559, at **1-2 (N.D. Ill. Mar. 23, 2016); *see Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 2015-2080, 2016 U.S. App. LEXIS 17370, *15 (Fed. Cir. Sept. 23, 2016) (affirming dismissal where the claims were directed to the general idea of customizing a user interface); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) (affirming district court's finding on a motion to dismiss that "offer-based price optimization" is a fundamental economic concept and that the claimed computer-based

10

implementation of that idea is routine and conventional); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713, 716-17 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015) (affirming dismissal based on § 101 ineligibility); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (affirming dismissal where the claims were directed to the well-known abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory"); *Nextpoint, Inc. v. Hewlett-Packard Co.*, No. 15 C 8550, 2016 U.S. Dist. LEXIS 74470, **8-21 (N.D. Ill. June 8, 2016) (granting motion to dismiss based on § 101 ineligibility); *O2 Media, LLC v. Narrative Sci. Inc.*, 149 F. Supp. 3d 984, 999 (N.D. Ill. 2016) (same).

**B.      The patents-in-suit are invalid due to lack of patentable subject matter.**

The patent claims here fail the *Mayo* test for patent-eligible subject matter. The asserted claims of the '470, '334 and '603 patents are all directed to the same abstract idea of collecting display instructions from a third party, organizing the display content at a central computer, and then displaying the content on conventional electronic displays. Limiting this idea to the field of digital signage or advertising does not save it from abstraction. And, the conventional steps and generic components recited by the claims add nothing inventive and cannot transform an abstract idea into a patent-eligible one. The asserted claims are therefore invalid under 35 U.S.C. § 101.

**1.      The asserted claims are drawn to an abstract idea.**

The first step in determining whether the asserted claims are directed to a patent-ineligible abstract idea is to examine the claims. A patent claim may be abstract if it is directed at "a fundamental economic practice," a "method of organizing human activity," or a "longstanding," "routine," or "conventional" practice. *Alice*, 134 S. Ct. at 2356. To make this determination, the Court looks at "the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, No. 2015-1778, 2016 U.S. App. LEXIS 13861, at *7 (Fed. Cir.

Aug. 1, 2016). Here, all of the asserted claims are directed to the concept of collecting display instructions from a third party (some external content provider, such as an advertising agency), organizing the display content at a central computer, and then displaying the content on conventional electronic displays. *See* '470 patent at claim 25; '334 patent at claim 22; '603 patent at claim 13. In other words, the asserted claims are directed to a method and system for a third party (such as an airline or advertiser) to display information (such as arrival and departure times or advertisements) on an electronic display (such as an arrival board or television or LED billboard) in accordance with instructions on the location and time to display the information. *See* '470 patent at 1:27-31; '334 patent at 5:33-45; '603 patent at 2:16-18. As such, the claimed limitations encompass both fundamental economic practices (*e.g.,* advertising on a digital medium) and basic methods of organizing human activity (*e.g.,* notifying passengers of flight departures). Claims directed to such practices are the very type that in *Alice*, "as in so many other § 101 cases," have been found to cover patent-ineligible abstract ideas. *Elec. Power Grp.*, 2016 U.S. App. LEXIS 13861 at *9. The patents' written descriptions themselves confirm the abstract nature of the claimed inventions. *See* '470 patent, col. 2:57 to 3:5 ("the present invention relates to a method of coordinating and controlling projectors . . . [whereby] [i]nformation display subscribers are connected to a computerized control centre [sic] via computer and telecommunication interfaces . . . wherein the control centre [sic] has a communication interface with computer devices situated in connection with said places for projector coordination and control . . . [and] is able to create and update a display list in real time with control instruction fields[.]"). By mimicking these descriptions of the alleged inventions in its Complaint, T-Rex's own pleadings underscore that the claims are directed to an abstract idea.

      **2.**    **The asserted claims contain no "inventive concept" to transform the abstract idea into a patent-eligible invention.**

Because the asserted claims are directed to an abstract idea, the Court must determine whether the claims contain an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357. The relevant question "is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *Id.* at 2359. The answer to that question plainly is no. At each step of the asserted method claims, purely conventional computer functionality is recited. Asserted method claim 25 of the '470 patent recites the steps of: (1) receiving an instruction from a third party, (2) generating an exposure list, (3) displaying information in accordance with the exposure list, and (4) permitting updates to the exposure list. These steps only require a generic computer to (1) receive an input, (2) create a basic list of display criteria based on that input, (3) display information based on that basic list of display criteria, and (4) allow a user to update the basic list of display criteria. "[A]ll of these computer functions are well-understood, routine conventional activit[ies] previously known to the industry." *Alice*, 134 S. Ct. at 2359. As such, they require nothing more than a "generic computer to perform generic computer functions," and do not transform the abstract idea into a patent-eligible invention. *Id.* Asserted method claim 22 of the '334 patent fares no better. It recites the steps of: (1) generating a basic list of display criteria, (2) using a computer ("control center") to create and update the list, and (3) using the basic list of display criteria to control electronic displays of information. This is not materially different from claim 25 of the '470 patent and similarly fails to add an inventive concept. Finally, considering these steps "as an ordered combination" adds nothing "that is not already present when the steps are considered separately." *Mayo*, 132 S. Ct. at 1298. Viewed as a whole in light of the specification, the asserted method claims simply recite the abstract idea of

collecting instructions from external content providers, organizing the display content at a central (generic) computer, and then displaying the content on computerized displays.

The asserted system claims similarly do not contain an inventive concept sufficient "to transform the abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2351. Where the corresponding system claims "are no different from the method claims in substance" and merely recite "a handful of generic computer components configured to implement the same [abstract] idea," the system claims are also abstract and invalid. *Id.* at 2360. Here, the system claims are not materially different from the method claims and recite only generic computer components. Asserted system claim 26 of the '470 patent, for example, merely recites "a computerized control centre" [sic] that includes "communication interfaces" and a "means for updating an exposure list," a "computerized device," and a "means for displaying images." Claim 32 of the '334 patent is similarly generic in that it recites a "computerized control center means," a "computerized means," an "exposure handler means," and "electronic displays." These claimed components either (1) call to mind the classically generic components that nearly every computer will include or (2) are otherwise conventional technology hidden behind new-sounding descriptors (e.g., "exposure handler"). As such, they plainly are insufficient to transform the abstract idea into a patent-eligible invention. *See TLI Communications*, 823 F.3d at 615 ("the 'control unit' predictably controls various aspects of the claimed functionality").

Claim 13 of the '603 patent (from which asserted claims 42 and 43 depend) similarly recites generic system components including, additionally, "a networked connection" of the displays. It is black letter law that receiving and sending information over a network "is not even arguably inventive." *BuySafe v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). The patent specification further underscores the generic nature of the claimed network by stating that "any

form" of network "may be utilized" with any combination of a laundry list of possible transmission mechanisms (examples include "dedicated phone" and "high speed cable"). '603 patent, col. 3:32-45. Claims 42 and 43 of the '603 patent are also insufficiently limiting to be inventive. The advance they purport to make is a split screen option to display both still-image and video at the same time. However, they plainly fail to provide any "particular assertedly inventive technology for performing those functions." *Elec. Power Grp.*, 2016 U .S. App. LEXIS 13861, at *8.

The same is true even when the system claims are considered as an "ordered combination," because the generic system components that perform the corresponding method steps add nothing "that is not already present" when considered separately. *Alice*, 134 S. Ct. at 2359. The allegedly innovative "combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience" (Complaint at ¶¶ 28, 29, 36, 43) is claimed only in generic and conventional terms. Accordingly, the claims' invocation of computers, networks, and displays does not transform the claimed subject matter into patent-eligible applications. *Elec. Power Grp.*, 2016 U.S. App. LEXIS 13861, at *11.

Finally, T-Rex asserts that its systems and methods for digital signage differ from conventional methods of digital signage—"beyond merely scheduling content to be displayed on remote screens" by providing "dynamic control" of the schedule and content of the displayed information. Complaint, ¶ 24. This, however, is of no legal significance because the asserted claims do not recite any specific means of dynamic control other than by utilizing a combination of generic computer components. Using conventional or generic technology, even if arguably in a "nascent" field of application, does not save a patent claim from abstractness. *TLI Communications*, 823 F.3d at 612.

15

## V.    CONCLUSION

The claims of the '470 patent, '334 patent, and '603 patent are not directed to patent-eligible subject matter as a matter of law.  For the foregoing reasons, Ziosk respectfully moves the Court to dismiss this case in its entirety with prejudice.

DATED:  October 21, 2016.                    Respectfully submitted,


                                             /s/ Samuel E. Joyner
                                             Samuel E. Joyner
                                               Texas Bar No. 24036865
                                               sjoyner@ccsb.com
                                             CARRINGTON, COLEMAN, SLOMAN &
                                               BLUMENTHAL, L.L.P.
                                             901 Main Street, Suite 5500
                                             Dallas, Texas 75202
                                             TELEPHONE: (214) 855-3000
                                             FACSIMILE: (214) 855-1333

                                             **ATTORNEYS FOR DEFENDANT
                                             TABLETOP MEDIA, LLC d/b/a
                                             ZIOSK**


## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Civil Procedure 5 and Local Rule 5.5(b), the undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system on October 21, 2016.


                                             /s/ Samuel E. Joyner
                                             Samuel E. Joyner